UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD SMITH and
LEO'S LOUNGE, INC.,
a Michigan corporation,

      Plaintiffs,

v

MICHIGAN STATE POLICE TROOPERS
DOUGLAS SUNDMACHER and
JEFFREY RUTHIG, and
PETOSKEY POLICE OFFICERS
LAWRENCE DONOVAN and
DAVID SCHULTZ,

      Defendants.

_____/

Case No 1:05-cv-64

Hon. Wendell A. Miles

OPINION AND ORDER ON DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

      In this removal action, plaintiffs Leo's Lounge, Inc. and its owner Richard Smith assert

federal and state law claims based on what they allege is police harassment perpetrated by the

defendants.  The matter is currently before the court on motions by the defendants for summary

judgment (docket nos. 58, 60, 81, 84).  Plaintiffs have opposed the motions, with one limited

exception noted below.  For the reasons to follow, the court GRANTS the motions.

**I**

      Plaintiff Richard Smith is a lifelong resident of Petoskey, Michigan.  Smith is the sole

shareholder and an officer and director of Leo's Lounge, Inc., a Michigan corporation which

does business in Petoskey as Leo's Sports Bar ("Leo's") and the Upstairs Club. It is undisputed that Leo's and the Upstairs Club are licensed liquor establishments which serve alcoholic beverages. Defendants Douglas Sundmacher and Jeffrey Ruthig were, at all times relevant to this action, employed as troopers for the Michigan State Police. (Sundmacher has since retired.) Defendants Lawrence Donovan and David Schultz were, at all times relevant to this action, law enforcement officers employed by the City of Petoskey Police Department.

Leo's began operation in 1938, owned by Smith's parents. Smith himself first purchased an ownership interest in Leo's in 1980, when he also began managing the bar. He became the sole owner of Leo's in 1996. Smith describes Leo's as a "neighborhood bar" which serves drinks and has a limited menu.

In 2003, Smith also began operating the Upstairs Club in the same building as Leo's, but on an upper floor. Although the Upstairs Club initially operated as a banquet facility, Smith envisioned it as more of a nightclub. Unlike Leo's, which had a menu and was open seven days a week, the Upstairs Club did not have a menu and was open only late at night on Friday and Saturday nights. The Upstairs Club operated under the same liquor license as Leo's, and Smith was always present while the Upstairs Club was open.

Smith, who fancies himself as someone with "a lot of contacts," claims to be a frequent visitor to the Emmet County Sheriff's office. In April, 2004, Smith read in the newspaper that the incumbent Sheriff, Peter Wallin, was to be challenged in the Sheriff's race by Sundmacher, who had announced his candidacy for the office. On April 26, 2004, Smith paid one of his visits to Wallin at the Sheriff's office. During this visit, Smith offered Wallin his support in the Sheriff's campaign and promised to attempt to generate support for Wallin from others in the

alcoholic beverage industry.  Smith also offered his financial support for Wallin, producing a check for Wallin's campaign in the amount of $200.  Smith further agreed to put one of Wallin's campaign signs in his front yard and to pass out campaign buttons and stickers when they became available.  Although Smith also contends that he signed a letter which would have permitted Wallin to use Smith's name as an endorsement, Smith admits that nothing came of the letter; it was apparently never published.  Smith also contends that he was a personal friend of Petoskey's Police Chief, Michael Vargo, and that he also regularly visited the Petoskey's mayor.

According to Smith, not long after he offered his support to Sheriff Wallin, he began noticing increased police attention to his businesses.  In early May, 2004, the amended complaint alleges, the defendants began a campaign of harassment against Smith and his businesses based both on Smith's political support for Sheriff Wallin and Smith's personal association with Chief Vargo, both of whom the defendants opposed personally and/or politically.  This alleged harassment included repeated liquor inspections and the "targeting" of Smith's customers.[1]

Smith has testified that Sundmacher came into the Upstairs Club at 2:00 a.m. on May 1, 2004, claiming to have just broken up a fight in the street outside the club and threatening that he was going to force Leo's to "clean up its act," or words to that effect.  Smith does not allege that Sundmacher or any of the other defendants told him that the basis for their attention to Leo's and the Upstairs Club was politically motivated.  Although Ruthig, who was a

---

[1]Smith apparently did not attribute any increased police attention to his businesses to a citation issued by the Michigan Liquor Control Commission ("LCC") against the Upstairs Club for allowing topless dancing on the premises without a permit on December 4, 2003.  Smith admitted that he made a mistake in permitting the dancing, and he pled guilty to the violation, which was initiated by a Petoskey police officer (not any of the defendants) who stopped the dancer for driving erratically.  Interestingly, the LCC hearing on the topless dancing citation was held on May 18, 2004, during the midst of Smith's alleged troubles with the defendants.

patrol partner of Sundmacher's, supported Sundmacher in the Sheriff's election, and Donovan and Schultz do not deny that they supported Sundmacher's candidacy, Smith had no information or knowledge that any of the defendants knew of Smith's support for Wallin.

Smith complained to Chief Vargo about the alleged harassment he believed was being perpetrated by Vargo's officers. When questioned by Vargo, Schultz admitted that he had asked Sundmacher to assist in investigating liquor violations against the Upstairs Club because Schultz was aware of a personal relationship between Vargo and Smith. Schultz also wanted help from someone outside the department, because Schultz believed that city officers were short of staff to deal with the problems caused by the club, and because Sundmacher was more experienced. However, Chief Vargo apparently did not take action against any of his officers; he agreed that Leo's and the Upstairs Club were presenting problems in Petoskey's central business district based on the sheer number of complaints and situations confronted by officers there. Vargo suggested that Smith take his complaints to the Michigan State Police. Smith claims that he lodged complaints with Sundmacher's supervisor, Lt. Aaron Sweeney, at the State Police post in Petoskey, but got no response.[2]

Plaintiffs contend that between April and August, 2004, the defendants collectively caused numerous liquor law violations to be brought against Leo's and the Upstairs Club by Michigan's Liquor Control Commission ("LCC"). These included charges arising from the following incidents:

---

[2]Lieutenant Sweeney checked dispatch records for the period between the summer of 2003 and June, 2004 and found that Leo's and the Upstairs Club accounted for 22 dispatched calls during that period, while two other licensed establishments, the City Park Grille and Mitchell Street Pub, had collectively only 18 calls.

4

At approximately 12:30 a.m. on April 24, 2004, an individual was found by officer Donovan in a prone position on a sidewalk in downtown Petoskey. The individual, who was intoxicated, had consumed numerous alcoholic beverages that night, most recently at the Upstairs Club. Three charges were filed arising from this incident. One charge was sustained by the LCC – allowing an intoxicated person to frequent or loiter upon the premises.

On April 25, 2004, a patron of the Upstairs Club was assaulted by another patron near closing time. The victim called 911 and required attention from emergency medical technicians. Officers Donovan and Schultz interviewed the victim and found him to be highly intoxicated. Four charges were filed arising from this incident. One charge was sustained by the LCC – allowing an intoxicated person to frequent or loiter upon the premises.

On May 11, 2004, an individual who was visibly intoxicated was served alcohol upon Smith's licensed premises. Three charges were filed arising from the incident, two of which were sustained by the LCC – selling alcohol to a visibly intoxicated person and allowing an intoxicated person to consume alcohol on the premises.

Leo's was charged with eight violations based on incidents occurring on June 5, 2004. Three of the charges were sustained by the LCC – selling alcohol to a visibly intoxicated person, allowing an intoxicated person to remain on the premises, and allowing fights or brawls on the licensed premises.

At some point during this same time period, Smith began closing 30 minutes earlier at night, and his businesses eventually stopped experiencing problems. Sundmacher was easily defeated by Wallin in an August 4, 2002 primary election. Although Wallin apparently enjoyed wide support, there is no evidence of any of his supporters having been targeted by Sundmacher or any of the other defendants, as plaintiffs allege they were targeted.

Plaintiffs originally filed this action in Emmet County Circuit Court in December, 2004, asserting federal and state law claims against the defendants alleging violation of 42 U.S.C. § 1983, tortious interference, civil conspiracy, and gross negligence. The defendants filed a notice of removal. Subsequently, plaintiffs filed an amended complaint containing supplemental

factual allegations, including two additional allegations against Ruthig in particular, contending that Ruthig's actions targeting Leo's were based on (1) Ruthig's personal religious belief in a Biblical proscription against drinking alcohol, and  (2) Ruthig's purported desire to become undersheriff of Emmet County in the event of Sundmacher's election as Sheriff.  Plaintiffs have since formally withdrawn these specific allegations against Ruthig.

## II

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512 (1986).  The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by "'showing'--that is, pointing out to the district court-- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553 (1986).  While inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S.Ct. 1348, 1356 (1986).

Only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are "material." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." Hartsel v. Keys, 87 F.3d 795, 799 (6th Cir. 1996).

The plaintiff must present more than a mere scintilla of evidence in support of its position; it must present evidence on which the jury could reasonably find for the plaintiff. Id. Although at the summary judgment stage the court must draw inferences in the plaintiff's favor, these inferences must be justifiable ones. See Beard v. Banks, 126 S.Ct. 2572, 2578 (2006) (at summary judgment stage, court draws "all justifiable inferences" in non-movant's favor); Anderson, 477 U.S. at 255, 106 S.Ct. at 2513 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor") (citation omitted); DePoutot v. Raffaelly, 424 F.3d 112, 121 (1st Cir. 2005) ("Although we must take the facts in the light most favorable to the nonmovant (here, the plaintiff) and draw inferences accordingly, . . . those inferences must be reasonable") (citation omitted); Mills v. Health Care Serv. Corp., 171 F.3d 450, 459 (7th Cir. 1999) ("while any inferences drawn from the facts must be viewed in the light most favorable to the non-moving party, only reasonable inferences need be made"); Bills v. Aseltine, 958 F.2d 697, 708 (6th Cir. 1992) ("Facts may be established by inference, but the inferences must be reasonable ones").

Finally, "[u]nder Fed.R.Civ.P. 56(e), evidence submitted in opposition to a motion for summary judgment must be admissible." U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1189 (6th Cir. 1997). "Accordingly, hearsay evidence may not be considered on a motion for summary judgment." Hartsel, 87 F.3d at 799; see U.S. Structures, 130 F.3d at 1189

("Hearsay evidence, as well as evidence which is irrelevant to the issue presented, must be disregarded").

After the defendants filed their motions, plaintiffs voluntarily withdrew that part of their claim which alleged that Ruthig targeted Leo's for selective enforcement because of Ruthig's religious beliefs or his hope that Sundmacher, if elected sheriff, would select Ruthig as undersheriff.  Because plaintiffs have withdrawn these allegations, the court assumes that plaintiffs do not oppose entry of summary judgment in favor of Ruthig on this aspect of plaintiffs' claims.


## III

At the outset, the defendants raise an objection to standing.  Specifically, they argue that although the complaint alleges that the corporate plaintiff suffered financial loss as a result of the defendants' actions, the only constitutionally protected activity alleged is Smith's endorsement of Wallin for sheriff.  The defendants argue that plaintiffs have not pled nor could they establish that any constitutional right of the corporate entity was violated.  Furthermore, they argue, Smith has not pled any damages to himself as a result of the alleged violation of his rights, and he lacks standing to maintain an action under § 1983 for damages suffered by a corporation in which he owns shares.

The defendants are correct that Smith, as an officer and sole shareholder of the corporation Leo's Lounge, Inc., does not have standing to sue for financial damages suffered by the corporation.  Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 602 -603 (6th Cir.1988); Gregory v. Mitchell, 634 F.2d 199, 202 (5th Cir. 1981).  What it is not clear

is whether the defendants are contending that the lack of standing (Smith's lack of standing to

sue for damage to the corporation and the corporation's lack of standing to sue for violation of

Smith's constitutional rights) is fatal to the entire case.  Plaintiffs have not responded to the

defendants' standing argument.  However, even assuming that plaintiffs' claims are not fatally

deficient for lack of standing, plaintiffs' claims are fatally deficient for other reasons addressed

below.

**IV**

To state a claim for relief in an action brought under § 1983, a plaintiff must establish

both that he was deprived of a right secured by the Constitution or laws of the United States and

that the alleged deprivation was committed under color of state law.  E.g., American Mfrs.

Mutual Ins. Co. v. Sullivan, 526 U.S. 40, 49-50, 119 S.Ct. 977, 985 (1999).  Where the defendant

makes a properly supported summary judgment motion in such an action, the non-moving party

must demonstrate a genuine issue of material fact as to these two elements.   Miller v. Calhoun

County, 408 F.3d 803, 812 (6th Cir. 2005).  Here, the defendants do not dispute that they acted

under color of state law.  What they do dispute is whether plaintiffs can establish that they were

deprived of a right secured by the Constitution.

In the amended complaint, plaintiffs alleges that the defendants have violated Smith's

rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution.  The

defendants have challenged each of the constitutional claims.  Plaintiffs have responded, albeit in

9

a highly disorganized manner.[3]  The court will consider each of the challenged federal claims

below.

The defendants also argue that they are entitled to qualified immunity. The Sixth Circuit

has recently employed a three-step inquiry in reviewing claims of qualified immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in
> the light most favorable to the plaintiffs show that a constitutional violation has
> occurred. Second, we consider whether the violation involved a clearly established
> constitutional right of which a reasonable person would have known. Third, we
> determine whether the plaintiff has offered sufficient evidence to indicate that
> what the official allegedly did was objectively unreasonable in light of the clearly
> established constitutional rights.

Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003) (internal quotation omitted).  Qualified

immunity must be granted if the plaintiff cannot establish each of the three required elements.

Sample v. Bailey, 409 F.3d 689, 696 (6th Cir. 2005).  Because – as discussed below –  the court

has concluded that plaintiffs have not shown that a constitutional violation occurred, the court

has no need to give further consideration to this affirmative defense.  See Harajli v. Huron

Township.  365 F.3d 501, 508 (6th Cir. 2004).


## A.  First Amendment - Free Speech and Association

Plaintiffs analyze Smith's First Amendment-based claim as one of retaliation.  The

elements of a First Amendment retaliation claim are as follows:


'(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken

---

[3]For example, in a section of their brief directed to the First Amendment, plaintiffs cite to
the law of due process.  Plaintiffs' Answer to Defendants' Motions for Summary Judgment
(docket no. 63) at 21-22.

against the plaintiff that would deter a person of ordinary firmness from
continuing to engage in that conduct; and (3) there is a causal connection between
elements one and two-that is, the adverse action was motivated at least in part by
the plaintiff's protected conduct.'

Muhammad v. Close, 379 F.3d 413, 416 (6th Cir. 2004) (quoting Thaddeus-X v. Blatter, 175 F.3d

378, 394 (6th Cir.1999)).

As the defendants have noted, Smith's alleged personal relationship with Chief Vargo

does not qualify as participation in "protected conduct" for purposes of the First Amendment.[4]

Smith contends that Donovan and Schultz, who served under Vargo, procured Sundmacher and

Ruthig's assistance in enforcing liquor laws against Leo's and the Upstairs Club based at least in

part on a perception that Smith's businesses were somehow untouchable by the Petoskey police

department because of Smith's relationship with Vargo.  However, even assuming this to be true,

plaintiffs cite to no law which recognizes a First Amendment claim against law enforcement

officers based on a perception that violations of the law are being overlooked due to a close

relationship between a suspected law breaker and law enforcement.   Therefore, Smith's

allegations of enforcement actions taken against him based on his association with Vargo do not

form the basis of a valid First Amendment claim.

_____

[4]In but another example of the confusion apparent in plaintiffs' brief, they argue that the
defendants have not argued that personal motives, such as Smith's alleged association with Chief
Vargo, do not support a First Amendment claim.  Plaintiffs' Answer to Defendants' Motions for
Summary Judgment at 21-22.  However, plaintiffs are wrong; the defendants have made this
argument.
    Plaintiffs also argue that the defendants have not argued that Sundmacher's desire to
ingratiate himself with local law enforcement and voters in the election by appearing to be tough
on alcohol enforcement does not support a First Amendment claim.  However, plaintiffs do not
cite to a single case which recognizes that a candidate's desire to appeal to a particular
constituency by enforcing the law forms the basis for a free speech claim.

11

Smith's allegation regarding his political support for Wallin, whom Sundmacher opposed in the Sheriff's election, stands on a different footing. However, the difficulty with this particular allegation, as the defendants have noted, is that plaintiffs have not pointed to any evidence that any of the defendants knew of Smith's support for Wallin. Without evidence of such knowledge, Smith's claim of retaliation fails as a matter of law because he can establish no causal connection between his support for Wallin and the adverse actions taken against him or his businesses.

Plaintiffs argue that Smith "publicly endorsed" Sheriff Wallin. Plaintiffs' Answer to Defendants' Motions for Summary Judgment (docket no. 63) at 2. Because Smith has admitted during his deposition testimony that he never personally informed any of the defendants of his support for Wallin, it is his alleged "public" support for Wallin that presumably forms the basis of Smith's First Amendment claims against each of the defendants. However, the fatal difficulty with plaintiffs' position that Smith's support for Wallin was "publicly" known is that the position is pure conclusion and speculation, unsupported by the record. None of the defendants worked for Wallin in the Emmet County Sheriff's Department, and therefore none of them would have reason to know that Smith visited Wallin, either on April 26, 2004 or before. Plaintiffs have likewise pointed to no evidence that any of the defendants were aware that Smith had written a check for Wallin's campaign. At best, plaintiffs have presented evidence that certain employees or friends of Smith and perhaps patrons of Leo's and the Upstairs Club were aware of Smith's support for Wallin. However, the knowledge of others does not equate with "public" knowledge, nor can it be imputed to the defendants. Plaintiffs' argument that Smith "publicly" supported Wallin is mere argument, not evidence. In the face of a complete lack of

evidence supporting a reasonable inference that the defendants knew of Smith's political support

for Wallin, Smith's First Amendment retaliation claim fails as a matter of law.[5]


## B.  Equal Protection

The Fourteenth Amendment's Equal Protection clause provides that "No State shall ...

deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

XIV, § 1. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure

every person within the State's jurisdiction against intentional and arbitrary discrimination,

whether occasioned by express terms of a statute or by its improper execution through duly

constituted agents."  Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 445, 43 S.Ct. 190

(1923) (internal quotation marks and citation omitted).  The Equal Protection Clause prohibits

discrimination by government which either burdens a fundamental right, targets a suspect class,

or intentionally treats one differently than others similarly situated without any rational basis for

the difference. Radvansky v. City of Olmsted Falls, 395 F.3d 291, 312 (6th Cir.2005); see also

Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531 (1985) ("the decision to

prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or

---

[5]It is also noted that recently, the Supreme Court held that "want of probable cause must
be alleged and proven" by a plaintiff bringing a § 1983 or *Bivens* suit for retaliatory prosecution.
Hartman v. Moore, 126 S.Ct. 1695, 1707 (2006). Therefore, a First Amendment retaliation claim
fails as a matter of law where the plaintiff fails to show lack of probable cause.
Barnes v. Wright, 449 F.3d 709, 719 (6th Cir. 2006).  Here, although plaintiffs argue that Leo's
and the Upstairs Club received the vast majority of liquor law citations during the period after
Smith decided to support Wallin, plaintiffs have not alleged or shown the lack of probable cause
for the citations.

other arbitrary classification, . . . including the exercise of protected statutory and constitutional rights") (citations and internal quotations omitted).

Smith does not claim to be a member of a traditionally suspect class. Instead, his Equal Protection selective enforcement claim is based on his allegation that the defendants treated him less favorably that others similarly situated because he exercised his constitutional right to support Wallin in the Emmet County Sheriff's election. Such selective enforcement claims are judged according to equal protection standards, which require a plaintiff to show both a discriminatory purpose and a discriminatory effect. Wayte, 470 U.S. at 608, 105 S.Ct. at 1531; Gardenhire v. Schubert, 205 F.3d 303, 318 (6th Cir.2000). In such a case, "the plaintiff must prove intent to punish for the act of speech[.]" Futernick v. Sumpter Twp., 78 F.3d 1051, 1057 (6th Cir. 1996).

In Gardenhire, the Sixth Circuit set forth the elements of a selective enforcement claim as follows:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

205 F.3d at 319 (quoting United States v. Anderson, 923 F.2d 450, 453 (6th Cir.1991)). "With regard to the first element, 'it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside his category were not prosecuted.'" Gardenhire, 205 F.3d at 319 (quoting Stemler v. City of Florence, 126 F.3d 856, 873 (6th Cir. 1997)). "Furthermore, 'there is s strong presumption that the state actors have properly

discharged their official duties, and to overcome that presumption, the plaintiff must present clear evidence to the contrary; the standard is a demanding one.'" Id. at 319.

Plaintiffs have failed to present any evidence from which a reasonable jury could find that they have proved the elements of a selective enforcement equal protection claim.   To demonstrate discriminatory effect, the claimant must show that individuals who are similarly situated, apart from the protected characteristic, were treated more favorably.  See United States v. Armstrong, 517 U.S. 456, 469, 116 S.Ct. 1480, 1488 (1996) (defendant alleging selective prosecution must produce some evidence that similarly situated defendants not in protected class could have been prosecuted, but were not); see also Harajli, 365 F.3d at 508 ("according to Gardenhire, 'it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside [his or] her category were' treated differently"); Stemler, 126 F.3d at 873 ("it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside her category were not prosecuted").  Plaintiffs have presented no evidence that other similarly situated licensed liquor establishments *whose owners did not share in Smith's support for Wallin* were not subjected to increased inspections and otherwise enhanced enforcement of the liquor control laws.

Plaintiffs argue that during the same time period in 2004 during which Leo's and the Upstairs Club received numerous violations, all of the other bars located in Petoskey's central business district received only one violation.  However, this evidence relates to only two other establishments – the City Park Grille and the Mitchell Street Pub – and plaintiffs have made no attempt to show who – if anyone – the owners of these businesses supported in the Emmet County Sheriff's election.   Because plaintiffs have failed to provide any support for Smith's

Equal Protection claim of selective enforcement based on Smith's alleged exercise of his constitutional right to support a candidate in the Sheriff's election, the defendants are entitled to summary judgment on this claim.[6]

### C.  Fifth and Fourteenth Amendments - Due Process

The amended complaint also alleges a denial of due process.  Section 1983 actions based on deprivations of due process fall into two categories: violations of procedural due process and violations of substantive due process.  Midkiff v. Adams County Regional Water District, 409 F.3d 758, 762 (6th Cir. 2005).  As the defendants have noted, the basis for plaintiffs' due process claim is unclear in this case, insofar as the amended complaint does not reference the type of due process violation alleged – procedural, substantive, or both.

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more

---

[6]Plaintiffs have not relied on a "class of one" theory, under which a claimant alleges that he was treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074 (2000).  A "class of one" plaintiff may demonstrate that government action lacks a rational basis either by negativing every conceivable basis which might support the government action, or by showing that the challenged action was motivated by animus or ill will.  Warren v. City of Athens, Ohio, 411 F.3d 697, 711 (6th Cir. 2005).

Even if plaintiffs had asserted a "class of one" equal protection theory, such a claim would fail.  Based on the number of dispatched calls to Smith's businesses, the defendants had a legitimate interest in enforcing the liquor laws there.  In addition, even though Smith has argued that Sundmacher harbored ill will against Chief Vargo, plaintiffs have not shown that Sundmacher's purported animosity or ill will against Vargo permits a reasonable inference of animosity against Smith or his businesses.  Plaintiffs have also not presented non-hearsay evidence that other similar businesses whose owners were not friendly with Chief Vargo were treated more favorably.

16

generalized notion of substantive due process, must be the guide for analyzing these claims.'"

Albright v. Oliver, 510 U.S. 266, 273, 114 S.Ct. 807, 813 (1994) (quoting Graham v. Connor,

490 U.S. 386, 395, 109 S.Ct. 1865, 1871 (1989)). To the extent that plaintiffs are alleging an

interference with a property interest as a basis for a due process claim, it is the Fifth

Amendment, and not substantive due process, is the basis upon which a plaintiff may challenge

the government's actions with respect to his property.   Banks v. City of Whitehall, 344 F.3d 550,

554 (6th Cir. 2003).  In addition, to the extent that plaintiffs are alleging improper searches or

seizures at Leo's or the Upstairs Club, the Fourth Amendment provides an explicit constitutional

protection against unreasonable searches and seizures.  See Boone v. Spurgess, 385 F.3d 923,

933 (6th Cir.2004); see also County of Sacramento v. Lewis, 523 U.S. 833, 843, 118 S.Ct. 1708,

1715 (1998) (Substantive due process analysis is inappropriate if claim is covered by the Fourth

Amendment).[7]  Because these amendments provide plaintiffs with constitutional protection,

---

[7]Although plaintiffs allege that the defendants began conducting unannounced inspections of Leo's and the Upstairs Club, this does not state a Fourth Amendment violation. The liquor industry is subject to pervasive regulation in Michigan, and this is a circumstance that may entitle the state to authorize warrantless searches of places where liquor is sold.  See Colonnade Corp. v. United States, 397 U.S. 72, 77, 90 S.Ct. 774, 777 (1970) (the liquor industry has long been subject to "close supervision and inspection"); see  37712, Inc. v. Ohio Dept. of Liquor Control 113 F.3d 614, 618 (6th Cir. 1997) ("Generally, the states possess broad powers under the Twenty-first Amendment to the Constitution of the United States (which repealed national prohibition of the sale of alcoholic beverages), as well as inherent police powers, to regulate, restrict, or ban the sale of alcoholic beverages within their borders").  Owners of business establishments operating in such closely regulated industries have a reduced expectation of privacy.  See New York v. Burger  482 U.S. 691, 700, 107 S.Ct. 2636, 2642-2643 (1987) ("An expectation of privacy in commercial premises, . . .  is different from, and indeed less than, a similar expectation in an individual's home . . . This expectation is particularly attenuated in commercial property employed in 'closely regulated industries'") (citation omitted).  Consistent with this well-established authority, Michigan's liquor control law authorizes warrantless inspections of liquor licensees' premises by law enforcement officers. M.C.L. § 436.1217(2).

(continued...)

plaintiffs have no claim based on substantive due process and the defendants are entitled to judgment in their favor as a matter of law on any substantive due process claim.

For a procedural due process claim, a plaintiff must establish a constitutionally protected liberty or property interest and show that such an interest was deprived without appropriate process. <u>Board of Regents v. Roth</u>, 408 U.S. 564, 569-70, 92 S.Ct. 2701, 2705 (1972); <u>LRL Properties v. Portage Metro Housing Authority</u>, 55 F.3d 1097, 1108 (6th Cir.1995). The Sixth Circuit applies a two-part analysis to procedural due process claims. "First, the court must determine whether the interest at stake is a protected liberty or property right under the Fourteenth Amendment. Only after identifying such a right do we continue to consider whether the deprivation of that interest contravened notions of due process." <u>Thomas v. Cohen</u>, 304 F.3d 563, 576 (6th Cir. 2002). Moreover, the Sixth Circuit has also stated that for the purposes of such claims brought under § 1983, "the plaintiff must plead and prove that state remedies for redressing the wrong are inadequate." <u>Vicory v. Walton</u>, 721 F.2d 1062, 1066 (6th Cir.1983). "[T]he plaintiff must attack the state's corrective procedures as well as the substantive wrong." <u>Id</u>.

Here, plaintiffs rest their procedural due process claim on their property interest – or at least Leo's property interest – in Leo's liquor license and the hours of operation permitted under the statute governing the license. <u>See</u> Plaintiffs' Answer to Defendants' Motions for Summary Judgment at 12. "Under Michigan law, a liquor license is property which includes the right to serve alcohol until 2:00 a.m." <u>R.S.W.W., Inc. v. City of Keego Harbor</u>, 397 F.3d 427, 436 (6th

---

[7](...continued)

Cir. 2005).  However, plaintiffs have pointed to no evidence whatsoever that any of the

defendants forced or even requested Leo's or the Upstairs Club to close earlier than 2:00 a.m.

Instead, the only evidence to which plaintiffs point addresses Smith's own decision to close

Leo's earlier than 2:00 a.m.  Plaintiffs' Exhibit 12.  Although Smith apparently concluded that

this decision would help him avoid what he conclusorily deemed "police harassment," id., he

also admitted that he intentionally geared his closing hours to those of other bars.  Defendants'

Exhibit 2 (docket no. 56), at 216-217.  Smith did not want to be known as a "last call bar"

because, in Smith's words, "We discourage bar hopping of people coming from other

establishments late.  I don't need other people's problems."  Id. at 21-22.  Plaintiffs have not

cited to any evidence that one or more of the defendants even raised the possibility that Smith

should close earlier than 2:00 a.m. Plaintiffs's procedural due process claim based on the

defendants' alleged interference with Leo's liquor license therefore fails because no such

interference has been shown.

However, even if plaintiffs had pointed to evidence that the defendants had intentionally

caused Leo's or the Upstairs Club to close early, plaintiffs have neither pled nor proven that they

were not provided with a remedy for this alleged interference with the liquor license.  As the

defendants have noted, plaintiffs had the opportunity to raise any objections in hearings before

the LCC.  Plaintiffs were therefore afforded process, and they have not addressed why this

process was not adequate.  Plaintiffs may not bring a constitutional due process claim simply

because they failed to utilize the proper state channels to assert their rights.  Hahn v. Star Bank,

190 F.3d 708, 716 (6th Cir. 1999).  In the absence of allegations and proof that the state

procedures for protecting the rights afforded by the liquor license were inadequate, plaintiffs

have no cognizable claim based on violation of procedural due process.


# V

The defendants have also challenged each of plaintiffs' state law claims.  The court considers each of these claims below.


## A.  Tortious Interference

Plaintiffs allege that the defendants interfered in plaintiffs' business relationships with unspecified third parties.  The elements of a claim of tortious interference, which is an intentional tort, are "the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff."  BPS Clinical Laboratories v. Blue Cross and Blue Shield of Michigan, 217 Mich. App. 687, 698-699, 552 N.W.2d 919, 925 (1996).  Although pecuniary damage is required to establish a claim, pecuniary damage is not in itself sufficient; instead, the plaintiff must show intentional and improper interference which induces or otherwise causes a third person not to enter into or continue a prospective relation with the plaintiff.  Winiemko v. Valenti, 203 Mich. App. 411, 417, 513 N.W.2d 181, 184 (1994) (citing 4 Restatement Torts, 2d, § 766B, p. 20).

As the defendants have noted, plaintiff have pointed to no admissible evidence that any particular customer was affected by the defendants' actions.  Instead, plaintiffs have pointed merely to hearsay from one of Smith's employees, William Wickman, who testified that the

bar's customers were concerned about police presence outside Leo's.  Plaintiffs' Exhibit 11 at

49-50.  Plaintiffs have not presented non-hearsay evidence from a single customer indicating that

the law enforcement activity around Leo's and the Upstairs Club caused them to stop frequenting

either bar.  Because plaintiffs have simply failed to point to admissible evidence supporting this

element of the claim of tortious interference, the court concludes that the defendants are, as a

matter of law, entitled to judgment in their favor on this claim.


### B.  **Gross Negligence**

Plaintiffs' amended complaint asserts a claim of gross negligence.  M.C.L. §691.1407

applies to governmental immunity from tort liability, and provides in pertinent part as follows:


> **(2)** Except as otherwise provided in this section, and without regard to the
> discretionary or ministerial nature of the conduct in question, each officer and
> employee of a governmental agency, each volunteer acting on behalf of a
> governmental agency, and each member of a board, council, commission, or
> statutorily created task force of a governmental agency is immune from tort
> liability for an injury to a person or damage to property caused by the officer,
> employee, or member while in the course of employment or service or caused by
> the volunteer while acting on behalf of a governmental agency if all of the
> following are met:
>
> > **(a)** The officer, employee, member, or volunteer is acting or
> > reasonably believes he or she is acting within the scope of his or her
> > authority.
> >
> > **(b)** The governmental agency is engaged in the exercise or
> > discharge of a governmental function.
> >
> > **(c)** The officer's, employee's, member's, or volunteer's conduct
> > does not amount to gross negligence that is the proximate cause of the
> > injury or damage.
>
> **(3)** Subsection (2) does not alter the law of intentional torts as it existed

before July 7, 1986.

*   *   *

(7) As used in this section:

(a) 'Gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

As the defendants have noted, plaintiffs' factual averments allege that the defendants intentionally targeted plaintiffs for selective enforcement of the liquor laws, not that the defendants negligently did so. The amended complaint therefore alleges intentional, not negligent, conduct. Plaintiffs may not mislabel a tort claim in order to avoid the legal requirements for the claim. See Jackson County Hog Producers v. Consumers Power, 234 Mich. App. 72, 592 N.W.2d 112, 117 (1999) (claim of trespass was "nothing more than a camouflaged claim of negligence" properly dismissed as time-barred); see also Smith v. Stolberg, 231 Mich. App. 256, 258-259, 586 N.W.2d 103,104-105 (1998) ("While plaintiff couches his claim in terms of a breach of defendant's duty 'not to engage in disruptive behavior, not to speak to opposing parties in a case in which defendant is engaged as counsel, and not to touch or strike members of the opposite parties' family,' plaintiff is essentially alleging an intentional, offensive touching. Therefore, plaintiff's proper cause of action is for the intentional tort of battery, and not negligence").

Michigan's governmental immunity statute does not create a cause of action; it merely defines the scope of immunity where a cause of action otherwise exists. Therefore, even if plaintiffs have properly pled a claim of gross negligence, they must still satisfy the elements for such an action. In Michigan, a cause of action for negligence requires that the plaintiff demonstrate that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached the

22

duty, (3) the defendant's breach of the duty proximately caused the plaintiff's injuries, and (4) the plaintiff suffered damages.  Smith v. Stolberg, 231 Mich. App. at 258, 586 N.W.2d at 104.

"Duty is a legally recognized obligation to conform to a particular standard of conduct toward another."  Halbrook v. Honda Motor Co., Ltd., 224 Mich. App. 437, 569 N.W.2d 836, 839 (1997).  The threshold issue of whether a legal duty is owed is a question of law for the court to decide.  Moning v. Alfono, 400 Mich. 425, 254 N.W.2d 759, 764-765 (1977).  A plaintiff suing a public employee must still establish the existence of a duty toward the plaintiff. See Beaudrie v. Henderson, 465 Mich. 124, 138-142, 631 N.W.2d 308-315-317 (2001).  The governmental immunity recognized in  M.C.L. § 691.1407 is an affirmative defense, not a cause of action to be alleged by a plaintiff.  Patterson v. Kleiman, 199 Mich. App. 191, 500 N.W.2d 761, 762 (1993), aff'd as modified, 447 Mich. 429, 526 N.W.2d 879 (1994).

In their brief filed in response to the defendants' motions, plaintiffs do not elaborate on the legal basis for their claims of gross negligence.   Instead, they merely rely on the immunity statute without identifying a Michigan statute or common law which imposes a duty on the defendants cognizable in an action alleging gross negligence.  Because plaintiffs have alleged that the defendants acted intentionally, and not negligently, and because they have not identified a legal duty owed to them by the defendants, the defendants are entitled to summary judgment in their favor on plaintiffs' claim of gross negligence.

## C.  Civil Conspiracy

Plaintiffs' amended complaint alleges that the defendants conspired  to selectively enforce the liquor laws against Leo's and put the company out of business.  "A conspiracy is a

combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means." Fenestra Inc. v. Gulf Am. Land Corp., 377 Mich. 565, 593-594, 141 N.W.2d 36, 48 - 49 (1966). "'The law is well established that in a civil action for damages resulting from wrongful acts alleged to have been committed in pursuance of a conspiracy, the gist or gravamen of the action is not the conspiracy but is the wrongful acts causing the damages. The conspiracy standing alone without the commission of acts causing damage would not be actionable. The cause of action does not result from the conspiracy but from the acts done.'" Id. (quoting Roche v. Blair, 305 Mich. 608, 613, 9 N.W.2d 861, 863 (1943)).  The plaintiff must show an unlawful means or purpose as an essential element of the conspiracy.  Mays v. Three Rivers Rubber Corp., 135 Mich. App. 42, 352 N.W.2d 339, 341 (1984).

Plaintiffs have pointed to no wrongful acts committed against them by the defendants other than those alleged as part of the alleged illegal scheme to enforce the liquor laws against Leo's and the Upstairs Club.  However, because plaintiffs' other causes of action based on this intentional conduct fail, so does the claim of civil conspiracy.  The defendants are therefore entitled to judgment in their favor as a matter of law on this claim.

### Conclusion

The motions of the defendants for summary judgment are GRANTED.

So ordered this 30th day of October, 2006.


 /s/ Wendell A. Miles
Wendell A. Miles
Senior U.S. District Judge